PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States

MATTHEW YELOVICH (NYBN 4897013)
Acting Chief, Criminal Division

DAVID J. WARD (CABN 239504)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      FAX: (415) 436-7230
      david.ward@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 21-00294 WHO |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K1.1 |
| v. | |
| PAUL FREDRICK GIUSTI, | Sentencing Date: December 14, 2023 |
| Defendant. | Time: 1:30 p.m. |
| | Judge; Hon. William H. Orrick |

## INTRODUCTION

Defendant Paul Frederick Giusti comes before this Court for sentencing after pleading guilty to one count of Conspiracy to Bribe a Local Official and Commit Honest Services Fraud. Giusti was the Group Government Relations Manager at Recology Inc., and admitted to helping direct over $1,000,000 in Recology funds to Mohammed Nuru, the head of the San Francisco Department of Public Works. At the time, Nuru was a high-ranking and powerful San Francisco public official with enormous influence over Recology's business. Giusti admits that he helped Recology direct these funds to Nuru to influence

1  Nuru to act to Recology's benefit.  Giusti admits that he knew that his conduct was corrupt and illegal.

2  While Giusti did not personally profit, he knew what he was doing was wrong.  To his credit, however,

3  once charged, Giusti accepted responsibility, pled guilty, and has provided substantial and unique

4  assistance to the government.  Given this, the government respectfully asks that the Court grant the

5  government's motion for a sentence reduction under § 5K1.1 and sentence Giusti to a term of three years

6  of probation that includes six months of home confinement, and impose a fine of $30,000.

7                                                    **BACKGROUND**

8  **I.      Offense Conduct**

9          **a.  Overview**

10         From February 2012 to June 2020, Giusti was the Group Government and Community Relations

11  Manager for Recology Inc., San Francisco's waste management company.  In this role, Giusti was the

12  executive with primary responsibility for managing Recology's relationship with local government

13  officials.  This included the relationship with Recology's most important regulator, Mohammed Nuru.

14         Giusti admitted to directing approximately $1,071,530 in bribes from Recology to Nuru or his

15  designees.  The bribes include $750,000 that Nuru directed be "donated" by Recology to a non-profit

16  ostensibly for city-wide cleanup events, but were in fact funds that Nuru controlled and was able to

17  direct how they were spent.  Giusti further admitted to arranging $60,000 in payments from Recology to

18  Nuru, concealed as donations to another non-profit, that were used by Nuru to fund four elaborate

19  holiday parties Nuru hosted for friends and political supporters.  Giusti also admits to arranging for a

20  paid internship for Nuru's son at Recology and then at a non-profit (with the internship funded by

21  Recology), as well as other benefits. The facts in this case are detailed in the Criminal Complaint (*Dkt*

22  *1)*, the Plea Agreement *(Dkt. 40)*, and the Presentence Report *(Dkt. 51)*, filed in this case.

23         **b.  Recology**

24         Recology Inc. provides refuse collection and disposal services for the City of San Francisco (the

25  "City").  *PSR* ¶ 7.  Since 1932, the company has had a monopoly on residential garbage collection in the

26  City.  *Dkt. 1* (Complaint) ¶ 20.  Every four to five years, Recology seeks approval from the City for an

27  increase in the rates it charges.  San Francisco approved rate increases for Recology in 2013 and,

28

1  relevant to this conspiracy, in 2017.  Officials from the Department of Public Works were in charge of

2  overseeing Recology's rate increase application process in 2017.   And no one was more involved than

3  Mohammed Nuru.

4         **c.     Nuru's Influence**

5         In 2016 and 2017, Nuru oversaw months of public hearings on Recology's rate increase

6  application.  *Id.*  ¶21.  Nuru and his staff at DPW evaluated Recology's proposals, heard from citizens

7  and others, analyzed Recology's application and supporting materials, and then issued a final report on

8  the application  *Id.* ¶ 21. In 2017, Nuru recommended, and the Rate Board ultimately approved, a 21%

9  increase in Recology' rates, which increased its revenues from waste collection in San Francisco from

10  $289 million in 2017 to $351 million in 2018.  *Id.* ¶ 24.

11        Former Recology Group General Manager John Porter, in a candid email to a subordinate,

12  explained the importance of Recology's relationship with Nuru, writing: "Mohammed is the Director of

13  DPW who ultimate signs off on our rates.  Needless to say, keeping him happy is important." *Id.* ¶  11.

14        In addition to the rate increases, Recology also needed Nuru's approval for a variety of other

15  revenue streams it sought from the City.  For example, Nuru could approve or deny Recology's access

16  to Zero Waste Funds, monies set aside as incentives for Recology to reduce waste.  *Id.*¶ 29.  Between

17  2015 and 2017 alone, Nuru approved Recology's requests for over $10 million of Zero Waste Funds for

18  capital improvements.  *Id.*  Nuru also had the authority to approve and increase the "tipping fees" that

19  DPW paid to Recology to accept waste from DPW at Recology's materials recycling facilities.  *Id.* ¶ 37.

20        **d.     Giusti's Role: Keeping Nuru Happy**

21        Through the conspiracy period, Giusti was the primary Recology executive interacting with

22  Nuru.  Giusti  was in charge of keeping Nuru happy.  From 2014 through 2017, he reported to a former

23  Recology executive.  From January 2018 until January 2020, he reported to John Porter, a co-conspirator

24  in the honest services fraud scheme.  *Dkt. 40* (Plea Agreement) ¶ 4; *see also United States v. Porter*, 22-

25  CR-00270 WHO.  Giusti arranged for Recology to provide a stream of benefits to to Nuru, all intended

26  to influence Nuru to use his official position to benefit Recology.  Giusti explained the importance of

27  Nuru to Recology's business, and the rationale for providing a stream of bribes to Nuru :

28

SENTENCING MEMORANDUM
CR 21-00294 WHO                      3                      v. 05/14/2020

Because of the power and influence he wielded in his official position, a happy Nuru was good for Recology's business. The converse was also true. Recology understood that an unhappy Nuru could be very bad for Recology's business. In order to ensure that Nuru was happy with Recology and to influence him to act in Recology's favor as opportunities arose, I was one of the people that helped direct a stream of payments and benefits to Nuru or his designees on Recology's behalf."

*Dkt. 40* (Plea Agreement)*. ¶ 6.

### 1.  Recology "Donations" to a Non-Profit at Nuru's Direction

From 2014 to 2019, Giusti helped arrange for Recology to contribute, at Nuru's direction and demand, $150,000 a year to a San Francisco non-profit ("Non-Profit A") for what was described as "Giant Sweep," a city clean-up program.[1]  *Dkt. 40*  (Plea Agreement) ¶ 8; *Dkt 1* (Complaint) ¶ 62. Giusti would arrange the donations, which were then approved by his superiors at Recology.  *Id.* ¶ 67; *Dkt. 40* (Plea Agreement) ¶ 9.

Nuru and the director of Non-Profit A would then arrange for the funds from Recology to be transferred to another non-profit ("Non-Profit B").  Nuru would then use those funds as he saw fit.  At times the monies would go to local cleanup programs that would benefit the City (and make Nuru and the DPW look good).  Other times Nuru directed that the funds be spent on DPW employee events, including parties, picnics, and other public events that showcased DPW (and Nuru).  *Id.*  Among payments that Nuru directed from these funds were thousands of dollars for DJ services, thousands of dollars more for DPW-emblazoned merchandise to give out at these events, including hat and t-shirts. *Id.* ¶ 74.  Giusti admitted in his Plea Agreement that the money Recology was contributing was done at the direction of Nuru, that he knew that the payment were important to Nuru, and that he arranged for Recology to provide the funds in order to "keep Nuru happy;" ie; to influence Nuru to act to Recology's benefit.  *Dkt. 40* (Plea Agreement) ¶ 9.

### 2.  Nuru's Annual Holiday Parties

In addition to the contributions to Non-Profit A, Giusti also helped arrange payments from Recology for Nuru's annual holiday parties.  From 2016 to 2019, Recology gave $60,000 to pay for

---

[1] Because the non-profit has not been charged criminally, neither the entity nor its executives are being named here.

increasingly elaborate and lavish holiday parties that Nuru hosted for friends, political supporters, and select DPW employees. *See Dkt. 1* (Complaint); *Dkt. 40* (Plea Agreement), and the *PSR.*

Giusti arranged and sought approval from his superiors for the annual payments, which totaled $5,000 in 2016, $15,000 in 2017, and $20,000 in 2018 and another $20,000 in 2019. *Dkt. 40* (Plea Agreement) ¶ 13. The first $5,000 payment was approved by Giusti's supervisor at the time (Executive A). *Id.* ¶ 12. The three subsequent payments were approved by co-conspirator John Porter, then Giusti's supervisor at Recology. *See United States v. John Porter*, 22-CR-00270 WHO.

Giusti and Porter concealed the payments within Recology by labeling them as "holiday donations" made out to the Lefty O'Doul's Foundation for Kids, ostensibly a non-profit charity for underprivileged children. But in fact, Lefty O'Doul's was a non-profit set up and controlled by another co-conspirator, Nick Bovis, who was bribing Nuru seeking separate benefits, including a lease for a restaurant at the San Francisco International Airport. *United States v. Nick Bovis,* 20-CR-0204 WHO. Bovis allowed Nuru to use the Lefty O'Doul' Foundation to conceal the source of the funds from Recology, which was not allowed to donate directly to Nuru or DPW. *Dkt. 40* (Plea Agreement) ¶ 13.

Giusti admits that he knew that the payments to the Lefty O'Doul's Foundation for Kids were not donations for underprivileged children, and Giusti admits that he knew they were disguised as such because Recology was not allowed to give money directly to Nuru or DPW. *Id.*

The holiday parties grew more elaborate each year, and each year Nuru demanded more from Recology. The parties were first held in to the Green Room at the San Francisco War Memorial, and then in 2019, Nuru moved the party to the James R. Herman Cruise Terminal at Pier 27, a dramatic open space overlooking the San Francisco Bay. *Dkt. 1* (Complaint). ¶ 31. Nuru selected the guest list, which grew every year to include various San Francisco dignitaries and other VIPs, including Recology executives. *Id.* Giusti explained that the holiday parties were important to Nuru because they allowed Nuru to showcase his power and importance in the city. *Dkt. 40* (Plea Agreement) ¶ 13. Giusti further admits that he sought approval for the donations as a way of influencing Nuru to take official actions on Recology's behalf. For example, in 2018, Recology was seeking an increasing in its "tipping fees" - the fees that DPW paid Recology to dispose of truckloads of solid waste at a Recology recycling facility

called Sustainable Crushing.[2]  *Id.* ¶ 14.

In a telephone conversation on November 26, 2018 intercepted by law enforcement, Nuru promised to increase the fees DPW paid to Sustainable Crushing.  *Id.*¶ 15.  In the same conversation, Nuru requested that Recology donate $20,000 that year for Nuru's annual holiday party.  *Id.*  Giusti admitted that he knew there was an implicit *quid pro quo* in Nuru's request- the money for the holiday party in return for Nuru's support for an increase in "tipping fees" paid to Recology.  As Giusti's Plea Agreement states: "[a]lthough Nuru did not explicitly condition his assistance with Recology's price increase on Recology's agreement to give $20,000 for the DPW holiday party, I understood that this was what Nuru wanted."  *Id.*  Giusti contacted his supervisor, John Porter, informed him of the conversation, and Porter approved the $20,000 payment. *Id.*¶ 16.  Porter also admitted that he knew the payments were made to influence Nuru to take actions to benefit Recology, including influencing him to increase the "tipping fees" that DPW paid to Recology.

### 3.   *Internship for Nuru's Son*

In 2015, Nuru asked Giusti for help in finding a job for his son.  *Id.* ¶ 9.  Giusti admits that he arranged for Nuru's son to work at a Recology subsidiary, Sunset Scavenger.  *Id.*  In 2017, Giusti admits that he was told by his supervisor that it would not look good for Recology to be employing the son of the DPW director, Recology's chief regulator.  *Id.* ¶ 11.  At that point, Giusti helped arrange another internship for Nuru's son at a local non-profit, and he further arranged for Recology to pay the local non-profit to fund the internship for Nuru's son.  *Id*. *Id.*   Giusti admits that the Recology approved the internship, agreeing to pay the non-profit $9,600 in 2017 and approximately $14,000 in 2018, all to cover the salary for Nuru's son.  *Id.*

### 4.   *Other Payments*

Giusti admits that he sought approval at Recology for additional payments to Nuru, including hotel stay during a trip to New York City with another city official, payment for the funeral costs of a DPW employee, as well other benefits.  *See Dkt. 40* (Plea Agreement).  Giusti admits that he sought

---

[2] The term "tipping" refers to the tipping of truckloads of waste.  DPW would bring a truck of waste to the Recology facility, where the bed would be tipped up and the contents dumped.  DPW would then be charged for each truckload of waste that was "tipped."

1    these payments "with the understanding an expectation that in exchange for these payments and

2    benefits, Nuru would use his influence as DPW Director to benefit Recology's business. *Id.* ¶ 21.

3                                          **ANALYSIS**

4    **I.      GUIDELINES CALCULATION**

5           The government agrees with U.S. Probation's calculation of the U.S. Sentencing Guidelines,

6    which are as follows:

7           a.      Base Offense Level, U.S.S.G. §2C1.1(a)(2):                                    12

8           b.      Specific offense characteristics under U.S.S.G. Ch. 2:

9                   The offense involved more than one bribe; §2C1.1(b)(3)                        +2

10
                    The value of the payments or benefits received was between $550,000
11                  and $1,500,000; U.S.S.G §2C1.1(b)(2); U.S.S.G. §2B1.1(b)(1)(E):               +14

12          c.      Acceptance of Responsibility, U.S.S.G. § 3E1.1(a), (b):                       - 3

13          d.      Zero-Point Offender USSG Reduction. U.S.S.G. § 4C1.1(a)(2) - (a)10            - 2

14          e.      Adjusted Offense Level:                                                       23

15          **a.      The Court Should Adopt Probation's USSG Calculation**

16                  **i.      Defendant's Objection to the U.S.S.G.s is Factually and Legally Incorrect**

17          The defendant objects to Probation's calculation of the USSGs, specifically the 14-point increase

18   in the Guidelines based on the amount of the bribes.  In the calculation of Giusti's Guidelines, his

19   offense level is increased by 14 points because the amount of the bribes was $1,071,530.34.  Under

20   §2C1.1 and §2B1.1, the offense level is increased by the amount of the bribes in this case., using the

21   table in § 2B1.1(b)(1) that is traditionally used to calculate loss in pecuniary fraud cases.

22          Defendant Giusti argues that because this 14-point increase is determined using this loss table

23   that the $1,071,530 should be treated as an actual pecuniary loss (It is not).  Defendant then turns to

24   Application Note 3 of the Commentary to § 2B1.1 of the Guidelines, which states that in cases where

25   loss is calculated under § 2B1.1(b)(1), that amount of loss shall be reduced  by "the money returned, and

26   the fair market value of the property returned and the services rendered, by the defendant or other

27

28   SENTENCING MEMORANDUM
     CR 21-00294 WHO                            7                              v. 05/14/2020

persons acting jointly with the defendant, to the victim before the offense was detected." *U.S.S.G. § 2B1.1, Comm. App. Note  3(E)(i).*

Using this Application Note, defendant argues that the victims of Giusti and Nuru's crimes were the residents of the City of San Francisco.  Defendant then notes that some of the funds Nuru demanded be paid to Non-Profit A were spent on things that benefitted at least some of the residents of the City of San Francisco, such as trash pickup or neighborhood cleanup events.  Based on this rationale, defendant argues that some of the "loss" was money that was returned to the victim, and therefore the U.S.S.Gs. should be reduced.  This is wrong.  It misconstrues "loss" in an honest services fraud case, mischaracterizes who the "victims" are, and makes an incorrect interpretation of what the victimization of these victims actually was.

>  ii.    **The Defendant is Charged With an Intangible Rights Offense; Not a Money or Property Fraud**

The first, and ultimately fatal misassumption in the defendant's argument is that there is a pecuniary loss in this case.  In traditional fraud cases, the defendant engages in a scheme to obtain "money or property" and in doing so, there is often a victim who suffers a financial loss.  *See* 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1341 (Mail Fraud).  In determining the proper Guidelines offense level for a defendant convicted of a money and property wire or mail fraud, the Court should calculate the amount of loss that the victims suffered because of the fraud.  *See* § 2B1.1(b)(1).  And in cases where some of that financial loss goes back to the victim, the offense level may be reduced.

Defendant Giusti has not pled guilty to money or property wire fraud, however, but *to honest services fraud* in violation of 18 U.S.C. §§ 1343, 1346.  The language of § 1346 is clear that in honest services fraud cases, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  As the Supreme Court noted in *Skilling v. United States*, in recounting the history of honest services fraud prosecutions, "[e]mpahsizing Congress' disjunctive phrasing, the Courts of Appeal, one after another, interpreted the term 'scheme or artifice to defraud" to include deprivations not only of money and property, but also of intangible rights."  561  U.S. 358, 400 (2010).

1    While the Supreme Court in *Skilling* did limit honest services fraud cases to those involving only

2    "bribes or kickbacks" it nonetheless upheld the definition of honest services fraud as encompassing non-

3    property, intangible fraud. *Id.* at 404.  The Court in Skilling noted that Congress, in passing 18 U.S.C.

4    1346, intended to included intangible rights of honest services as actionable under the federal fraud

5    statutes. *Id.* At 404-405 ("[t]the definite article 'the' [in 18 U.S.C. 1346] suggests that 'intangible right

6    of honest services' had a specific meaning to Congress when it enacted the statute—Congress was

7    recriminalizing mail- and wire-fraud schemes to deprive others of *that* 'intangible right of honest

8    services,' which had been protected before *McNally,* not *all* intangible rights of honest services whatever

9    they might be thought to be." *Id., citing United States v. Rybicki, 354, F.3d 124, 137-138 (2003) (italics

10   in original).*

11    Given this, it is clear that defendant Giusti's honest services fraud admission was one of

12   scheming to deprive the citizens of San Francisco, not of money, but of the *intangible* right to the honest

13   services of Mohammed Nuru, a public official.  As such, §2B1.1's Commentary Application Note Three

14   has no application to this case and cannot be the basis for a reduction in defendant's offense level.

15          **iii.    The "Victims" of Giusti's Fraud Did Not Receive any Services or Refund**

16    In addition to the fact that there is no definable pecuniary loss in this case, defendant's argument

17   for a reduction relies on an incorrect definition of who the victims are. The U.S.S.G. Commentary that

18   defendant cites directs that the total loss be reduced by "the money returned, and the fair market value of

19   the property returned and the services rendered, by the defendant or other persons acting jointly with the

20   defendant, to the victim before the offense was detected."  *U.S.S.G. § 2B1.1, Comm. App. Note  3(E)(i).*

21    The victims in this case are <u>all</u> of the residents of the City and County of San Francisco, who

22   expect and demand that their public officials act to benefit the public, not to specific individuals or

23   entities based on bribes or kickbacks.  Here, Recology gave over $750,000 that Nuru could use as he

24   saw fit.  The evidence establishes that *some* of this money went to *some* residents of San Francisco, who

25   may have received free t-shirts or hats, or benefitted from cleanup efforts, or, for some DPW employees

26   who enjoyed parties and handouts paid for by Recology's bribes.  But that is not money being returned

27   to the victims; it is Nuru using the bribes in ways that benefitted him, showcased his power, and

28

SENTENCING MEMORANDUM

1    demonstrated his largesse.  Certainly that is not what the Sentencing Commission envisioned when

2    noting that the amount of loss can be reduced by money returned to the victim.

### iv.    The Victims Did Not Suffer a Financial Loss that Could be Returned

4         Even if the Court were to accept that those select residents of San Francisco who happened to

5    benefit from Nuru's use of Recology's bribe were a proxy for the victims of the offense, as noted above,

6    they were victimized not by losing money, but by being denied the honest services of Mohammed Nuru.

7    Payments to them for cleanup events or parties does not count as a reimbursement of their loss.

8         In fact, to the extent there was any financial loss in this case, that loss was suffered by the

9    shareholders and employees of Recology, who had their company's money misused to pay bribes to

10   Nuru.[3]

11        Here, Nuru demanded, and Recology paid, over $150,000 a year that was surreptitiously

12   funneled through two non-profits, so that money could be used by Nuru as a "slush fund" to reward

13   friends and allies, bolster his support at DPW and within the City, and showcase his largesse as "Mr.

14   Clean."  The true victims in the case, the residents of the City of San Francisco, expected that Nuru

15   would use his position to do the work of the people of San Francisco, not influenced by bribes paid by

16   Recology.  Recology was expected to do honest business with the City, not funnel its "donations"

17   through their regulator, Nuru, in return for benefits that Nuru was uniquely positioned to provide.

18        The fact that some portion of the bribe payments from Recology may have been used for

19   purposes that had in part some altruistic bent does not mean that they were paid to the "victims" of this

20   fraud, and therefore the "loss" from the fraud should not be reduced by a corresponding amount.

21   **II.    SENTENCING RECOMMENDATION**

22        **A.    Legal Standard**

23        The U.S. Sentencing Guidelines serve as "the starting point and initial benchmark" of any

24   sentencing process, and are to be kept in mind throughout the process.  *United States v. Carty*, 520 F.3d

25   984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007).  The

26

27        _____

28   [3] Recology has an ESOP (Employee Stock Ownership Plan), and as such, much of the company is owned by its employees.

overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991.  In accomplishing that goal, the Court should consider the factors set forth in 18 U.S.C. § 3553(a), to include:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)   the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3)   the need for the sentence imposed to afford adequate deterrence to criminal conduct; and,
>
> (4)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

**C.    The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a) Sentencing Factors**

**1.    Giusti and Recology Betrayed the Public Trust**

As the Court is well aware, this case arises out of a large-scale federal investigation into public corruption in the City of San Francisco that has uncovered years of what was systemic and corrosive betrayal of the public trust by certain San Francisco Public officials and those seeking to do business with the City.[4]  Few types of cases implicate the second sentencing factor above – "the need … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" – in the way that public corruption offenses do.  The Supreme Court has repeatedly noted the harm wrought by public corruption schemes.  As Justice Clarence Thomas explained, bribery is the "perversion or destruction of integrity in the discharge of public duties." *Nixon v. Shrink Missouri Government*, 120 S. Ct. 897, 923 (J. Thomas, dissent), quoting 3 Oxford English Dictionary 974 (1989). Chief Justice William Rehnquist echoed the same sentiment in *Federal Election Commission v. National*

---

[4] *See United States v. Mohammed Nuru*, 21-CR-0490 WHO; *United States v. Walter Wong*, 20-CR-0257 WHO; *United States v. Harlan Kelly*, 21-CR-0402 RS; *United States v. Nick Bovis*, 20-CR-0204 WHO; *United States v. Balmore Hernandez*, 20-CR-0353 WHO; *United States v. Alan Varela*, 21-CR-0192 WHO*; United States v. William Gilmartin*, 21-CR-0192 WHO; *United States v. Florence Kong*, 20-CR-0354 WHO; *United States v. Sandra Zuniga*, 21-CR-0096 WHO. *United States v. Recology Inc.* 21-CR-0356 WHO, *United States v. Paul Giusti*, 21-CR-0294 WHO; *United States v. John Porter*, 22-CR-0270 WHO; *United States v. Zhang Li*, 23-CR-0220 WHO; *United States v. Z&L Properties*, 23-CR-0221 WHO; *United States v. Ken Wong*, 23-CR-0162 WHO.

*Conservative Political Action Committee*:, writing: "corruption is the subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." 470 U.S. 485, 497 (1985).

There is no dispute that throughout this conspiracy, Nuru was the San Francisco public official with the most power and influence over Recology and its multi-million business with the City. Nuru was instrumental in setting the rates Recology charged the City for its services. Nuru oversaw other contracts Recology sought with the City of San Francisco, and Nuru's agency, DPW, in particular. Nuru was Recology's regulator and a key overseer. Giusti admits as much: "Nuru was a powerful public official who had great influence of City business, including the City's relationship with Recology. *Dkt. 40* (Plea Agreement) ¶ 5. Nuru was deeply corrupt, betraying and abusing his position for profit and power. He was the quintessential grifter. Defendant Giusti knew this, and he fed Nuru's greed in order to benefit Recology. He approve the funneling over $1,000,000 in Recology money for Nuru's use, including paying for an internship for Nuru's son, funding elaborate lavish holiday parties, and providing Nuru with a slush fund of monies to use as he saw fit.

Giusti admits that he sought these funds intending to influence Nuru, and the evidence is clear that Nuru tied the payments to favorable treatment, and that Giusti provided these benefits to Nuru intending to influence him to act in Nuru's favor. *Id.* ¶ 6. Giusti also knew what he was doing was wrong. Giusti admitted that when Nuru was arrested, he deleted text messages and emails that he had exchanged with Nuru. *Id.* ¶ 25. This conduct would normally warrant a substantial custodial sentence. However, here, the Court should consider two countervailing and mitigating factors.

First, while Giusti was a knowing and willing participant in the conspiracy, he was also operating within a corporation, and with the approval of his managers, particularly John Porter, but also Porter's predecessor. While this does not excuse his conduct, which he knew was wrong, it is a factor the Court should consider when determining Giusti's relative culpability, and when fashioning a sentence that is sufficient but not greater than necessary, and one that avoids unwarranted sentencing disparities. Second, and far more significant, Giusti was a key and early cooperator with the

1   government's investigation.  Giusti was the first, and remains the only individual, inside Recology to

2   come forward, admit their conduct, plead guilty, and provide substantial assistance to the government.

3   **II.     MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G.  5K1.1**

4        **a.  The Court Should Grant the Government's 5K1.1 Motion**

5        "Upon motion of the government stating that the defendant has provided substantial assistance in

6   the investigation or prosecution of another person who has committed an offense, the court may depart

7   from the guidelines." § 5K1.1.  The Court may consider the following when determining the appropriate

8   amount of the reduction; 1) the court's evaluation of the significance and usefulness of the defendant's

9   assistance, taking into consideration the government's evaluation of the assistance rendered; 2) the

10  truthfulness, completeness, and reliability of any information or testimony provided by the defendant; 3)

11  the nature and extent of the defendant's assistance; and 4) the timeliness of the defendant's

12  assistance. U.S.S.G. § 5K1.1.

13       In this case, Giusti's cooperation has been substantial and significant.  Most important, Giusti

14  was the first and only conspirator within Recology to come forward, plead guilty, and agree to cooperate

15  with the government into the portions of the FBI's public corruption investigation focused on Nuru and

16  Recology.  In the government's view, it was Giusti's cooperation that was key to the government's

17  ability to secure a deferred prosecution agreement with Recology Inc.  Giusti would also have been one

18  of the most important government witnesses in the trial against John Porter.  In the government's view,

19  the specter of Giusti, Porter's subordinate, testifying against him had to have weighed heavily in Porter's

20  decision to plead guilty 25 days before trial.

21       Given this, the government respectfully submits that a substantial assistance § 5K1.1 departure is

22  warranted, and would ask this Court to grant its motion for this downward departure.

23       **b.  A Variance from the U.S. Sentencing Guidelines is Warranted**

24       The government further requests that the Court, in imposing sentence, also vary downward from

25  the Sentencing Guidelines to reflect several sentencing factors outlines in 18 U.S.C. § 3553.  First,

26  Section 3553(a)(1) directs the Court to look at "the nature and the circumstances of the offense" and

27  Section 3553(a)(2) states that the sentence imposed needs to "reflect the seriousness of the offense."

28

1    There is no question that defendant Giusti's conduct, and the nature of the offense, is incredibly

2    serious and warrants significant punishment.  But in weighing the Court's sentence, the government

3    respectfully posits that there are two mitigating factors that warrant a variance and a lesser sentence than

4    the Guidelines would recommend.

5    First, defendant Giusti's Guidelines are increased by 14 points because the amount of the bribes

6    was $1,071,350.  While that is correct factually, and as noted above, Giusti's Guidelines are correctly

7    calculated, the resulting offense level based on this increase overstates the severity of Giusti's conduct in

8    the government's view.  First, $750,000 of those bribes were paid by Recology ostensibly for a "Giants

9    Sweep" cleanup, and while there is no dispute that the payments were made at Nuru's request and to his

10   benefit, the payments were also the type of community altruism that Recology would legitimately want

11   to support given its role in the community.

12   Second, as this Court noted in sentencing Giusti's superior Porter, unlike other defendants who

13   stand convicted for bribing Nuru for their personal benefit or the financial benefit of their companies, in

14   this case, Giusti received no personal financial benefit from his participation in the bribes here.  While

15   there may have been some intangible professional benefit to him by "keeping Nuru happy," that is far

16   different from bribes intended to influence Nuru to provide the bribe payers hundreds of thousands of

17   dollars in contracts and business. *See United States v. Walter Wong*, 20-CR-0257 WHO; *United States v.*

18   *Harlan Kelly*, 21-CR-0402 RS; *United States v. Nick Bovis*, 20-CR-0204 WHO; *United States v.*

19   *Balmore Hernandez*, 20-CR-0353 WHO; *United States v. Alan Varela*, 21-CR-0192 WHO*; United*

20   *States v. William Gilmartin*, 21-CR-0192 WHO; *United States v. Florence Kong*, 20-CR-0354 WHO.

21   Finally, Giusti was acting with the blessing of at least two of his superiors, a former Recology

22   executive who was not charged, and co-conspirator Porter, who pled guilty and has been sentenced by

23   this Court.  While seeking approval for his conduct and operating within a corporation does not

24   exculpate defendant Giusti, it nonetheless is a mitigating factor that the Court should consider, much as

25   it did in sentencing defendant Porter.  Porter was sentenced in September to six months of home

26   confinement, three years of probation, and fined $30,000. *See Porter*, 22-CR-00270 WHO.

27

28

Defendant Giusti's recommended Guidelines range is higher than that of Porter, and Giusti's participation in the conspiracy spanned a longer period of time and involved more bribes that what Porter admitted to participating to.  However, Porter did not cooperate with the government; in fact, he pled guilty more than two years after being initially charged, and only 25 days before trial.  Conversely, Giusti pled guilty promptly, accepted responsibility, and cooperated vigorously with the government. Given this, the government asks that the Court vary downward in its sentencing of Giusti to avoid an unwarranted sentencing disparity with Porter.

Finally, as noted in the PSR, Giusti has assets that can support the payment of a criminal fine. Given that Giusti did not act for his own personal benefit, the government asks the Court to impose a lower fine than it has on those defendants who acted for their own benefit or the benefit of their companies, such as Florence Kong ($95,000 fine), Balmore Hernandez ($100,000) and Alan Varela ($100,000 fine).  *Varela*, 21-CR-0192 WHO*; Hernandez*, 21-CR-0192 WHO;  *Florence Kong*, 20-CR-0354 WHO.  In this case, the appropriate fine is the $30,000 fine that was also imposed on Porter. *United States v. John Porter*,  22-CR-0270 WHO.

## III.     CONCLUSION

For the foregoing reasons, the government recommends that the Court grant the government's motion for a downward departure under U.S.S.G. § 5K1.1,and also vary from the recommend U.S. Guidelines, and sentence defendant Giusti to three years of probation, including 6 months of home confinement, and impose a $30,000 fine.

PATRICK D. ROBBINS
Attorney for the United States

Dated: December 7, 2023

*/s/ David J. Ward*
DAVID J. WARD
Assistant United States Attorney